## WOODBURN *v.* CINCINNATI, N. O. & T. P. RY. Co.

*(Circuit Court, E. D. Tennessee, S. D.* December 20, 1889.)

**1. CARRIERS—OF GOODS—SHIPPING CONTRACT.**

Plaintiff made a shipment on a road connecting with defendant's, and took a receipt from the agent, which stated that the company was "not accountable for weight, number, or condition of the packages." Following this was the name of plaintiff, destination of the goods on defendant's road, and the words, "Valuation limited to $5.00 per 100 pounds in case of total loss." On the back was printed a statement that "when a valuation as agreed upon shall be named upon this shipping receipt, it is distinctly understood that such valuation shall cover loss or damage from any cause whatever;" also a printed statement that the owner of the goods, in accepting the receipt, agrees to be bound by all its stipulations, written or printed, as fully as though signed by him. Plaintiff then signed and delivered to the company a paper stating that he had voluntarily shipped at a lower rate than the general tariff, on condition that he release the company from all liability for loss or damage, and containing a formal release to the company, and all other railroad or transportation companies to whom the goods should be delivered for transportation. This release was attached to the manifest, went along with the goods, and was received by defendant. The shipping receipt was not under seal, or witnessed, and was retained by plaintiff. The goods were received by defendant at a freight rate agreed on between the roads. *Held*, that the shipping receipt and release were separate and independent papers, prepared and signed at the instance of the company receiving the goods; and that defendant could not, in its own interest, elect which of the two should be treated as the shipping contract.

**2. SAME—SHIPPING RECEIPT.**

The shipping receipt, not having been executed as a contract under seal, and not having been regarded and treated as one by either of the railroad companies, and having been put forward as the rate of indemnity on a total loss when there was only a partial loss, cannot be made the basis of plaintiff's recovery.

**3. SAME—LIMITING LIABILITY.**

As the release executed by plaintiff provided for a complete and unconditional exemption of the carrier from liability on account of loss or damage to property in the course of transportation, it is void, as against public policy, and plaintiff is entitled to recover for the full value of his goods lost.[1]

**4. SAME—LIABILITY OF CONNECTING LINES.**

When the unconditional release came into the hands of the defendant's agents, together with the goods shipped, it was notice to defendant of the illegality of the transaction, and its liability must be determined by the principles of the general law.

At Law. Action for damages to freight.
*W. H. De Witt* and *Wheeler & Marshall*, for plaintiff.
*Lewis Shepherd*, for defendant.

KEY, J. The plaintiff shipped a car-load of furniture and other household goods, at the city of Philadelphia, upon the Pennsylvania railroad. Their destination was Chattanooga. They came over the lines of the Pennsylvania Railroad to the city of Cincinnati, and were delivered to the defendant, and were started over its line to Chattanooga. On their way, two of defendant's locomotives, drawing trains in opposite directions, collided, and the car containing plaintiff's goods was wrecked, and most of his goods destroyed. This suit has been brought for the value of the goods, and a jury is waived, and the whole case is left to the court for decision.

---

[1] Respecting the extent to which common carriers may limit their liability by contract, see Railroad Co. v. Thomas, (Ala.) 3 South. Rep. 802, and note 2; Express Co. v. Harris, (Ind.) 21 N. E. Rep. 340, and note; The Portuense, 35 Fed. Rep. 670, and note; Hull v. Railway Co., (Minn.) 43 N. W. Rep. 391.

The Pennsylvania Railroad Company executed a receipt for this carload of freight, dated February 27, 1888. This paper was handed to the plaintiff, and is produced by him. On its face is stamped: "Loaded by the shipper. Pennsylvania R. R. Co. Not accountable for weight, number, or condition of packages." There is written in the blank space for marks and description of property:

| "M. A. Woodburn,          | Valuation Limited         |
|---------------------------|---------------------------|
| Chattanooga,              | to $5.00 per 100 lbs.     |
| Hamilton county,          | in case of total loss.    |
| Tennessee.                |                           |
| 71 cts.  10,000 lbs."     |                           |

On the back of this receipt is printed, in very legible characters:

"When a valuation, as agreed upon, shall be named upon this shipping receipt, it is distinctly understood that such valuation shall cover loss or damage from any cause whatever."

This receipt, as it is styled, has various other stipulations and conditions printed upon its face and back, but they apply mainly, if not altogether, to the general course of shipments, and the current course of business, upon the lines of the railroad. The case in hand is contested upon the ground that it is exempt and different in its features from the run of ordinary transactions with public common carriers, and only the special and peculiar language involved in the controversy is quoted. The concluding clause in the printed conditions upon the back of the receipt is as follows:

"And finally, in accepting this shipping receipt, the shipper, owner, and consignee of the goods and the holder of the shipping receipt, agree to be bound by all its stipulations, exceptions, and conditions, whether written or printed, as fully as if they were all signed by such shipper, owner, consignee, or holder."

This shipping receipt was signed by the agent of the railroad company, and delivered to the plaintiff. At the same time, and as a part of the transaction, the plaintiff signed a paper in the following language:

"I, M. A. Woodburn, have this day delivered to the Pennsylvania Railroad Company, at Shack station, the following property, viz.: One car household furniture marked, 'M. A. Woodburn.' And I have agreed to pay freight on the same at the rate of ———— cents per hundred pounds from Philadelphia to Chattanooga; and I do hereby acknowledge that I have had the option of shipping the above-described articles at the rate of ———— cents per hundred pounds, according to the general tariff of said company, and thereby retaining the security of the liability of said company as common carrier of said property upon the line of their own railroad, but that I have voluntarily decided to ship at the above-mentioned rate of ———— cents per hundred pounds, and to release the said company, and any other railroad or transportation company to whom the said articles may be delivered for transportation to or towards their place of destination, of and from all liability for breakage, leakage, loss, damage, decay, delay, or otherwise howsoever, to said property, considering that the difference·in my favor in the cost is more than equivalent to the risk of transportation. And I do therefore, in consideration of the premises, remise, release, quitclaim, and discharge the said railroad company, and

all other railroad or transportation companies to whom the said property may be delivered for transportation to or towards its place of destination, of and from all claims, demands, or liability whatever for breakage, leakage, loss, damage, decay, delay, or otherwise howsoever to said property, while the same is in their care, custody, or possession; and I hereby authorize the said railroad company, as my agents, to deliver said property to any other railroad or transportation company over whose route it is necessary to be carried to its place of destination; and I agree that the said railroad company shall not be considered as carriers of said property beyond the line of their own road, or in any event to be held liable for the negligence or non-performance of any other railroad or transportation company to whom the said property may be delivered as aforesaid."

In a note below the signature of the plaintiff the paper provides that "this contract (in addition to contract in G—Form 41) is to be executed by all shippers of light furniture, household goods, or other property for which a release is required, if shipments are destined to points beyond the lines noted above. It should be pinned to and forwarded with the manifest accompanying the shipment." The shipping receipt mentioned heretofore is noted as "G—Form 22B." This car-load of goods was sent from Philadelphia to Cincinnati over the Union Line, which embraces the Pennsylvania Railroad and the Pittsburgh, Cincinnati & St. Louis Railroad, under the management of the Pennsylvania Railroad, and was there delivered to the defendant, to be taken to Chattanooga. The delivery slip of the Union Line shows that the car was delivered to the defendant March 2, 1888; that the weight of the goods was 24,000 pounds; that freight was charged thereon at the rate of 56 cents per 100 pounds, of which the Union Line was entitled to 31 cents and defendant to 25 cents,—that is, the Union Line would receive the sum of $74.40 and the defendant $60; and a like slip of the Cincinnati Street Connection Line shows that it was entitled to $2.40 for carrying the car between the two lines of railroad, and, when this sum is deducted from the $60, defendant's share of the charges of transportation, it leaves the net sum of $57.60 due defendant, as stated by witness Bryan. This delivery slip furnishes all the evidence on the part of defendant as to the rates charged; but it is shown by defendant's proof that if full damages had been claimed, or were to be claimed, in case of loss, the rate would have been doubled, or nearly so. Plaintiff swears that it was agreed that he should be charged 47 cents per 100 pounds on his shipment, and that the higher rate was 92 cents.

In the case of *Inman* v. *Railway Co.*, 129 U. S. 139, 9 Sup. Ct. Rep. 249, the chief justice, in delivering the opinion of the court, says:

"To secure care, diligence, and fidelity in the discharge of its public functions, the common law charged the common carrier as an insurer; but the rigor of the rule has been relaxed so as to allow reasonable limitations upon responsibility, at all events, to be imposed by contract. We have, however, uniformly held that this concession to changed conditions of business cannot be extended so far as to permit the carrier to exempt himself, by a contract with the owner of the goods, from liability for his own negligence."

In *Hart* v. *Railroad Co.*, 112 U. S. 340, 341, 5 Sup. Ct. Rep. 151, it is said:

"The limitation as to value has no tendency to exempt from liability for negligence. It does not induce want of care.' It exacts from the carriers the measure of care due to the value agreed on. The carrier is bound to respond in that value for negligence. The compensation for carriage is based on that value. The shipper is estopped from saying that the value is greater. The articles have no greater value for the purpose of the contract of transportation between the parties to that contract. The carrier must respond for negligence up to that value. It is just and reasonable that such a contract, fairly entered into, and where there is no deceit practiced on the shipper, should be upheld. There is no violation of public policy. On the contrary, it would be unjust and unreasonable, and would be repugnant to the soundest principles of fair dealing and of the freedom of contracting, and thus in conflict with public policy, if a shipper should be allowed to reap the benefit of the contract if there is no loss, and to repudiate it in case of loss. * * * The subject-matter of a contract may be valued, or the damage in case of a breach may be liquidated, in advance. In the present case, the plaintiff accepted the valuation as 'just and reasonable.' The bill of lading did not contain a valuation of all animals at a fixed sum for each, but a graduated valuation, according to the nature of the animal."

Again, page 343, 112 U. S., and page 157, 5 Sup. Ct. Rep., it is said:.

"The distinct ground of our decision in the case at bar is that where a contract of the kind signed by the shipper is fairly made, agreeing on the valuation of the property carried, with the rate of freight based on the condition that the carrier assumes liability only to the extent of the agreed valuation, even in cases of loss or damage by the negligence of the carrier, the contract will be upheld as a proper and lawful mode of securing a due proportion between the amount for which the carrier may be responsible and the freight he receives, and of protecting himself against extravagant and fanciful valuations."

In a later decision it is stated:

"The carrier and his customer do not stand upon a footing of equality. The individual customer has no real freedom of choice. He cannot afford to higgle or stand out, and seek redress in the courts. He prefers rather to accept any bill of lading, or to sign any paper, that the carrier presents; and in most cases he has no alternative but to do this, or abandon his business. Special contracts between the carrier and the customer, the terms of which are just and reasonable, and not contrary to public policy, are upheld. * * * But the law does not allow a public carrier to abandon altogether his obligations to the public, and to stipulate for exemptions which are unreasonable and improper, amounting to an abnegation of the essential duties of his employment. It being against the policy of the law to allow stipulations which will relieve the railroad company from the exercise of care or diligence, or which, in other words, will excuse it from negligence in the performance of its duty, the company remains liable for such negligence. * * * The general doctrine is nowhere stated more explicitly than in *Hart* v. *Railroad Co.*, and *Insurance Co.* v. *Transportation Co.*, [6 Sup. Ct. Rep. 750, 1176,] just cited. * * * In the one, [the *Hart Case*,] a contract fairly made between a railroad company and the owner of the goods, and signed by the latter, by which he was to pay a rate of freight based on the condition that the company assumed liability only to the extent of an agreed valuation of the goods, even in case of loss or damage by its negligence, was upheld as just and reasonable, because a proper and lawful mode of securing a due proportion between the amount for which the carrier might be responsible and the compensation which he received, and

of protecting himself against extravagant and fanciful valuations, which is quite different from exempting himself from all responsibility whatever for the negligence of himself and his servants." *Steam Co.* v. *Insurance Co.*, 129 U. S. 441, 442, 9 Sup. Ct. Rep. 469.

The principles and distinctions of these decisions are so clear that they need neither comment nor elucidation, and upon them rests the controversy in this trial. The defendant, in support of his defense, relies upon two papers,—one, the shipping receipt, signed by the railroad agent; and the other, the contract, signed by the plaintiff. These papers are separate and distinct in character, different in their provisions, and dissimilar in terms. They cannot be regarded as complementary to each other, as evidence of the same contract. It is true they bear the same date; and we may infer that they have reference to the same property, looking to the face of the papers only. The first paper has written upon its face: "Valuation limited to $5.00 per hundred pounds, in case of total loss." The second paper stipulates "to release the said company, and any other railroad or transportation company to whom the said articles may be delivered for transportation to or towards their place of destination, of and from all liability for breakage, leakage, loss, damage, decay, or delay, or otherwise howsoever, to said property, considering the difference in my favor in the cost is more than equivalent to the risk of transportation. And I do therefore, in consideration of the premises, remise, release, discharge, and quitclaim the said railroad company, and all other railroad or transportation companies to whom the said property may be delivered for transportation to or towards its place of destination, of and from all claims, demands, or liability whatever for breakage, leakage, loss, damage, decay, delay, or otherwise howsoever, to said property, while the same is in their care, custody, or possession." This is a contract for complete exemption from any and all liability on account of loss or damage to the property in the course of its transportation, and manifestly against public policy, and void under the decisions cited. Admitting that the first contract is such as might be legal in its character, which of these papers is to control in the decision in this cause, under the circumstances of this case? The last contract is signed by the plaintiff. It is a form of agreement prepared and presented to him by the railroad, for his signature. When signed, it was witnessed by two of the officers of the railroad company. It is under seal, and on its face it is stated that "this contract should be pinned to and forwarded with manifest accompanying the shipment." It was so forwarded, and came along, with the manifest of the goods, to the hands of the defendant, and is produced upon the trial as evidence protecting it from or limiting its liability. It was the contract that went along with the goods, and stopped when they stopped. It was the paper that the officers and agents of the transportation companies saw when the goods came to their hands. The other paper was signed by the agent of the railroad company only. It was not witnessed, nor was it under seal. It did not travel with the goods. The stub or invoice upon which its special features were copied remained in the possession of the railroad company at Philadelphia until produced

for this trial. With the parties thus situated, in the language of one of the decisions already quoted, "the carrier and his customer do not stand upon a footing of equality." The individual customer has no real freedom of choice. He cannot afford to higgle or stand out, and seek redress in courts. He prefers rather to accept any bill of lading, or sign any paper, that the carrier presents." Both these papers were prepared by the railroad company, and executed at its instance. After a collision has taken place between the contracts, it can hardly be permitted to the company to select from the wreck the paper most beneficial to its interests, and require the other party to be controlled by its provisions. Equity and justice demand the contrary.

But it may be insisted that, while all this may be true as between the Pennsylvania Railroad Company and the plaintiff, it does not apply to the defendant. It is true that the defendant made no contract with the plaintiff as to the transportation of these goods. The goods were delivered to it by the Pittsburgh, Cincinnati & St. Louis Railway Company, a member of the Union Line. The witness of the defendant states that the goods were shipped under a limitation of value. He knew the fact from the notations on the delivery slip, which showed the contract of shipment of these goods, "that the rate of freight was much less than the regular freight rate for that class of goods. It was less because the shipper assumed the risks of damage and loss in course of transportation, and agreed that the value should be limited, in case of loss, to $5.00 per 100 pounds." When the witness is asked to file any written or printed contract which accompanied the delivery of the goods to the defendant, or has been received since, and to attach all of them to his deposition, he responds:

"As requested, I hereto attach the contract, street connection, transfer slip, and the delivery slip, marked, respectively, 'Exhibits A, B, and C.' They were received, with the goods, March 3d, 1888, from the P., C. & St. Louis Ry. Company."

The contract attached is the original contract signed by the plaintiff, which is required to be pinned to and accompany the manifest of the shipment. The street connection transfer slip shows only that the car with the goods marked to plaintiff, "Chattanooga, Tenn.," had passed over its line; that the goods weighed 24,000 pounds, and its share of freight thereon was $2.40. The delivery slip of the Union Line shows by its heading that this line is composed of the Pennsylvania Railroad and Pennsylvania lines west of Pittsburgh. That the car of goods had been shipped from Shackamaxon station, February 27, 1888, manifest No. 28, car 5,054, and arrived at Cincinnati, March 2, 1888. That the goods were marked: "M. A. Woodburn, Chattanooga, Tenn. One car household furniture, at owner's risk. Care of Cin. Southern." That the weight of the freight was 24,000 pounds; rate, 56 cents per 100 pounds, of which the Union Line was entitled to 31 cents and the Cincinnati Southern to 25 cents. Not one word is said in either of these papers about the limitation of value to $5 per 100 pounds in case of total loss. The contract, and the only contract, accompanying the delivery of the goods

to the defendant is that executed by the plaintiff, exempting the company from any and all liability in case of loss or damage. The witness, however, states that the delivery slip from the connecting carrier shows a rate which is the rate for household goods shipped under a limitation of value in case of loss. The idea of the witness is that the two papers constitute a single contract of a compound character; that is, that the paper signed by the plaintiff as shipper, in consideration of the reduced rate of freight, exempted the companies from all partial damage or injury,—from such as did not amount to a total loss; and that the limitation of value in the paper signed by the railroad agent applied to total loss, exclusively. The contract evidenced by the paper signed by the plaintiff is void, whether its provisions apply to partial or total losses; and, under the theory suggested, that is, that both papers constituted but one contract, the nature and character of the provisions which invalidated the stipulations of the void paper must taint and destroy the entire contract. Being contrary to public policy, every part of the contract inhering in or dependent upon these illegal stipulations must fail.

But the stipulations of the paper executed by the plaintiff do not embrace or pertain to partial losses only, but they include damages and losses of every kind and character, both partial and total. When this paper came to the hands of defendant's agents, along with the goods to which it referred, it was notice to the defendant of the illegality of the transaction, and does not shield or protect it. Again, if the one paper applied to partial losses only, and the other paper to total losses only, the last paper would have no force or effect in this cause, because there has been no total loss of the goods. The plaintiff has accepted and received of the goods a quantity weighing about 500 pounds, and many more of them remained in the hands of the defendant in a damaged state. We have, under the condition of things, under the theory suggested, no liability on one writing because the loss is not total, and no liability on the other writing because its terms exclude any recovery under it for any injury, however it may arise. Such a contract, everything else out of the way, would not be fair and reasonable, and would be invalid on that account. A contract of the character of this should not only be fair and reasonable, but should be carried out fairly, and in substantial conformity to its provisions. This was not done in the business under consideration, conceding the validity of the contract executed by the agent of the railroad. That paper shows no rate for the freight, but it does show that there were 10,000 pounds of the freight. One of the witnesses for the defendant testifies that he weighed the goods, and they amounted in weight to 10,040 pounds. The testimony further discloses that the consideration of the limitation of $5 per 100 pounds upon the value of these goods was the reduced rate plaintiff was to pay for transportation, and that this rate was about one-half the rate which was charged when there was no limitation upon the value of the shipment. The delivery slip given by the Union Line to the defendant, at the time the goods were delivered to it, represented the goods to be of the weight of 24,000 pounds, and charges freight accordingly. The

freights thus charged were upon more, by weight, than twice the quantity of goods received for shipment, so that plaintiff was charged more than double the amount contracted for, and more than the full rate would have been had no contract of limitation of value been made. It is not probable that the change of weight was intentional; but it is unexplained, and, so far as plaintiff is concerned, operates to his prejudice as much as if it had been intentional. If the railroad company abandoned its contract, the plaintiff might disregard and abandon it, and the parties would be left to be controlled by the general law applicable to the transaction.

It may be insisted that, whatever the conduct of the Pennsylvania Railroad Company may have been, the defendant is innocent of any wrong. It did not enter into any contract with the plaintiff in respect to the transportation of these goods. That it received the goods in the usual course of business between itself and the Union Line, as connecting lines of public common carriers, without notice of any wrong-doing. All this appears to be true. But the defendant did receive the goods, as such carrier, for transportation, and undertook to deliver them at their point of destination. While the goods were in its custody they were damaged or destroyed by its negligence. If it had no special valid contract with the plaintiff limiting its liability, its responsibility must be determined by the principles of the general law. The defendant made no such special contract upon its own account. Such contract as was made for it was made by the Pennsylvania Railroad. That contract is invalid, as we have seen, and cannot stand. The result is, the defendant's contention here must be determined under the principles of the public law, unaffected by any special contract. Defendant must be held responsible for the injury to the goods to the full extent of the damage to them by the collision in which they were wrecked.

There is but one item in the lot of goods about which there is any controversy as to value. That is the value of a piano. The plaintiff proves the value of the goods shipped to have been $3,396.43. He admits that he has received of goods shipped various articles of the value of $704.81, which, subtracted from the gross sum, leaves $2,691.62. Among the articles which make this sum are a piano and stool valued at $500. The piano was in use about 10 years, and was stored in 1874, and remained in store until just before it was shipped, when it was overhauled and repaired at a cost of $50. It cost originally $700. The valuation must not be a fanciful one. It must be such a sum as it would bring in the market, provided the owner wanted to sell, and the purchaser wanted to buy. Such a piece of goods is likely to be highly prized by the family, and an exaggerated opinion be entertained by them of its value. The piano was more than 20 years old, and would not probably bring a high price in the market. Taking the proof in regard to it altogether, I think $250 would be a fair market price for it at the time of the accident. The plaintiff says he has never paid freight upon the shipment. As he receives full damages, he ought to account for the freights, which amount to $134.40. This amount, added to the $250

deducted from the charges for the piano, produces the sum of $384.40, which, when taken from the balance due according to plaintiff's statement, will leave $2,307.22, for which he will have judgment, with interest at the rate of 6 per cent. from May 1, 1888, and costs.