Downey, Judge,
reviewing the facts found to be established, delivered the opinion of the court.
The agents of the United States, by authority of an act of Congress and in aid of navigation, constructed a dam across the Devisa Fork of the Big Sandy River at a point six-tenths of a mile below the mouth of Griffiths Creek, a tributary of said river. Conditions were such that it was not deemed advisable to construct a fixed dam of the type usually used in rivers of that kind and a movable dam was built, so constructed that the wickets could be lowered onto the bottom of the river or could be raised and maintained in position as a dam, as might be desired. When lowered the dam did not appreciably interfere with the natural flow of the water in the river, but when raised it performed the same function as a fixed dam and created a pool above, extending up the river, theoretically level with the crest of the dam, as far as resulted naturally from the fall of the river above. The pool in this instance extended up the river beyond the mouth of Griffiths Creek and for a distance up that creek.
The plaintiff owned a considerable body of land lying east of the river and near, but not immediately contiguous thereto, and beginning opposite a point some five or six hundred feet above the dam. Along and near the east bank of the river from below the dam to and beyond the upper line of plaintiff’s lands was the right of way and tracks of a branch of the C. & O. Railway which were at an elevation considerably higher than pool level, so that the stage of water created by the dam could not flow upon plaintiff’s lands from the river direct. Griffiths Creek followed a meandering course through a part and along the boundary line of a paft of plaintiff’s lands and flowed into the river at a point approximately one-half mile above the lower side of said lands. The railroad crossed this creek near its mouth *206 on a bridge, and when the dam was in operation the waters of the pool created thereby were backed up in said creek and overflowed portions of plaintiff’s low lands lying along the creek.
The findings show that at pool level 15.31 acres of plaintiff’s land, including 3.90 acres in the bed of the creek, were overflowed. They also show that a stage of water 1 foot above pool level overflowed 18.23 acres, 2 feet above pool level overflowed 20.07 acres, 3 feet above pool level overflowed 22.68 acres, and 4 feet above pool level overflowed 24.86 acres, the 3.90 acres of creek bed included in each instance. The plaintiff sues as for taking under the Fifth Amendment to the Constitution, and in his petition seeks recovery for the value of 35 acres of land together with growing crops thereon, but in his requested findings of fact limits the acreage for which he seeks recovery to 24.86 acres, the amount which it is shown would be overflowed when the water was 4 feet above pool level.
In considering the case briefly we do not regard it as necessary to refer specifically to the several decisions of the Supreme Court which have considered the question of a taking under circumstances similar to these, since we have quite recently and somewhat at length reviewed those which would seem to be particularly applicable in the case of the County Court of Marion County, West Virginia, ante, p. 120. It would seem only necessary in this case to consider the conclusions to be drawn from the facts found.
It will readily appear from the facts found as to the character and use of the dam in question that it did not cause any permanent overflow of any part of plaintiff’s land. It appears from the findings, which summarize the resultant conditions during the period with reference to which we are furnished with the facts, that there were considerable portions of the time when the dam was down and not in operation, and during those periods it is evident there was no flooding caused by the dam, and any floods which occurred during those periods were from natural causes irrespective of and not contributed to by the dam. However, the dam was built to be used whenever for the accomplishment of its purposes it might be necessary, and the United *207 States was of course assuming the right to put it in operation whenever it saw fit and continuously if it saw fit. In the Cress case, 243 U. S. 316, it is said: “If any substantial enjoyment of the land still remains to the owner, it may be treated as a partial instead of a total divesting of his property in the land”; and where “land is not constantly but only at intervals overflowed, the fee may be permitted to remain in the owner, subject to an easement in the United States to overflow it with water as often as necessarily may result from the operation of the lock and dam for purposes of navigation.”
While it appears from the findings that the lands here in question had been overflowed before the construction of the dam and that they had been overflowed after the construction of the dam but when the dam was not in operation, and that the dam for a quite material part of the time with reference to which we are furnished with the record was not in operation, it also appears that the periods when the dam was in continuous operation were very largely during the season when crops were growing and maturing. During the year 1913, which is the only full year for which we are furnished the record, it appears that the dam was not in operation at all during the first four months of the year, and that it was not in operation for 10 days in May and for 17 days in June, but that it was continuously in operation during the five months from July to November, inclusive. It is true that for a considerable portion of the time during these five months the water was below pool level, but it must be assumed that that condition resulted because the natural flow of the water in the river and its tributaries was not sufficient to raise the water to, and maintain it at, pool level.- The purpose of maintaining the dam in operative position must have been to fill the pool, and if the natural supply of water had been sufficient for the purpose the result of the maintenance of the dam in position during those months would have been to maintain continuously a pool level of water. The lands in question were agricultural lands, and it seems quite evident that the maintenance of pool level continuously during these five months of the year, or even, as the facts were, in *208 that particular year for tbe greater portion of that time, must certainly serve to render unfit for cultivation all of the plaintiff’s lands which were overflowed at pool level, and to deprive the owner of any substantial enjoyment thereof.
But the plaintiff claims compensation for much more than that which was overflowed at pool level. He claims for all which would be overflowed at a height of water 4 feet above pool level. This acreage, it may be said, has been determined by a topographic survey of the lands. It does not in fact appear from the record that after the construction of the dam water ever reached a height of 4 feet above pool level except in one instance, when it is shown that the dam was not then in operation. It is shown that on various occasions the water was over the crest of the dam. There are many days when it was less than 1 foot over the dam, a few days when it was between 1 and 2 feet over the dam, a still fewer days when it was between 2 and- 3 feet over the dam, and one day, when, for a few hours, it was 3.3 feet over the dam. While it is to be assumed that on these specified days when the water was the given heights above the crest of the dam it was correspondingly higher on plaintiff’s lands, it is not shown that such increased heights of water upon plaintiff’s lands was due to the operation of the dam. To the extent of the height of the dam when in operation, it is, of course, intended that the flow of the water shall be obstructed and necessarily backed up. When the water is 1, 2, or 3 feet over the top of the dam, it is plainly apparent that the flow of that increased height of water is not stopped by the dam, and if there be a corresponding increased height of water on plaintiff’s lands, the reasonable assumption is that it is an increased height of water caused by flood waters coming down the creek, and is in no sense backwater thrown on the lands by operation of the dam.
If plaintiff, under such circumstances, can maintain that all of his land which would be overflowed when the water was 4 feet over the crest of the dam has been taken by the operation of the dam, he may as well be permitted to claim compensation for all land overflowed when the water was at the height of 4.7 feet, and yet it appears from the record *209 that on the only occasion when the water reached the last-named height the dam was not in operation. If there may be any possible theory that the operation of the dam when the water is higher than the crest of the dam retards the flow of water so as to cause an increased height of water on plaintiff’s land, it is purely a theory in support of which there is no showing in the record and apparently no justification for its indulgence. We have concluded that the intended results from the operation of the dam are such as to constitute a taking of all of plaintiff’s lands which were overflowed at pool level. The plaintiff asserts his right to recover the value of certain crops growing upon these low lands when the dam was first put in operation and destroyed by overflow soon after. While it is shown in the findings that these particular crops were destroyed by high water which occurred when the dam was not in operation, their value is indicated in the value of the lands found. This, we take it, is the correct method of assessing the value and not by separate findings as to the value of the crops.
Some evidence is in the record tending to show interference at pool stage of water with the use of two fords over the creek which the plaintiff used in passing from one part of his farm to the other, also with reference to a spring overflowed at pool level, and also with reference to an old mill site, the utility of which is said to have been interfered with, and findings are requested with reference to these matters, but there is no declaration with reference to any of them in the petition. The petition seeks recovery only for the value of the land taken and the crops growing thereon and recovery must be so limited.
For the value of the land taken at pool level, the plaintiff will have judgment for $1,148.25, and it is so ordered.
Hay, Judge; Barney, Judge; Booth, Judge, and Campbell, Chief Justice, concur.